Bissell, P. J.
The copartnership transactions between Lendholm and Bailey gave rise to this suit, and the circumstances attending the cessation of their business raises the only question which the record permits us to determine. There are other matters, but as we look at them, they are not of sufficient consequence to warrant us to disturb the judgment.
With reference to this one matter we think the court erred, providing it shall ultimately find the facts as they now appear. As we look at the record we in no manner interfere with the findings of the court. Those findings are very inaptly and inartificially drawn. They might have been so construed as to conclude us.
With reference to the pivotal question, to wit, the statute of limitations, all the court said was that the action was not barred by the statute. While this is stated as one of the findings of fact, it is not such at all, but is simply a conclusion of .law which the court drew from the proof. The findr ing is that the evidence preponderates to the point that the business did not terminate until the property was disposed of, and that the partnership transactions were not closed up until the last sale was made in 1891. Conceding all these matters there is no direct finding of fact to the point that there was no dissolution of the partnership at a date long antecedent to the time the last of the partnership property was sold or the last of the indebtedness of the concern paid off. We state these preliminary facts to show that we have no desire to interfere with the findings and recognize the force of the rule which we almost'universally follow, to treat 'them' as conclusive, and we now proceed to state what the record shows in respect of those matters which we regard as determinative. . .
Lendholm and. Bailey, without, written articles, entered *192 into a copartnership in 1885 or 1886 to deal in cattle. Bailey was the owner of a ranch, or had the control of some land, and together, they borrowed first from Mr. Gebhart, and after-, wards from The German National Bank very considerable sums of money which were put into cattle and run as a herd, and disposed of by the firm. The parties do not seem to have made more than two purchases. From time to time afterwards the cattle were sold, until in 1887 there remained of all the cattle which they had bought, — being about ten or twelve thousand dollars worth, —about fifty-five head. There is a good deal of controversy between Lendholm and Bailey about a bill of sale which Lendholm made of his interests in the remaining cattle in August, 1887. It is contended on one side that the bill of sale was executed in order to transfer all of Lendholm’s interests to Bailey, and upon the consideration that he was to take care of the outstanding debts of the concern. We do not think the evidence preponderates that way, and we are not inclined to disagree with the trial court which found that there was no agreement that Bailey should take the bill of sale and pay the debts. There is a strong element of improbability about it, resulting from the fact that the cattle were worth about $1,100 and the debts amounted to about $2,200, and it is not likely as a business proposition that Bailey, who then had possession of the cattle, would have taken them and agreed to pay largely more than they were worth. We make no reference to the circumstances under which the bill of sale was delivered in August, 1887, nor do we comment on what was then done, or on the testimony of Jeffries who was present, because it is unimportant. The truth is, the bill of sale was given to Bailey and from that time on he remained in possession of the property, to wit, the cattle which he ultimately traded for a house to which he took the title. We do not undertake to find out whether this was in pursuance of the authority contained in the bill of sale, because as we imagine we find a better reas on for it in a transaction somewhat later than that at which the bill was executed, We imagine the truth is, that after the bill of sale *193 was given, the firm was by both parties treated as dissolved and at an end. The situation was totally unlike that which would prevail in an ordinary commercial or manufacturing business, where there is a large amount of property on hand which must be sold, and where there is a large amount of bills payable and bills receivable to be collected and paid,— conditions which always require a-good deal of time and a good deal of labor. This really was a partnership to handle a bunch of cattle. The parties borrowed the money to buy them, and when they sold them undertook to pay their obligations with the proceeds. When the cattle were sold and the debts paid, that was all there was of the partnership or of the partnership business. In reality, according to the evidence as it now stands, both the parties abandoned the copartnership and quit it and ceased to do business together as a firm in 1887. There is no question about that situation as the proof now stands. We do not hold that it was done when the bill of sale was given in August, because it does not follow from that circumstance under the court’s findings. The fact of the dissolution, however, is very clearly shown by subsequent proceedings. When the bill of sale was given, Bailey and Lendholm were indebted to the German National Bank in the sum of about $2,100, represented by a couple of notes. The debt matured either wholly or partially in November and December, 1887, and at the time of the maturity Bailey went to the bank and took up the paper. He did not pay it, but he gave other notes of his own with an indorser, Frank Cochrane, which the bank accepted in lieu of Bailey and Lendholm’s paper, secured by the same indorser. It is wholly unreasonable .to conceive or imagine that Bailey would have taken up that paper with notes of his own, unless there had been an actual dissolution of the partnership. It would have been his privilege as it would have been of any business man, to have had the paper renewed with Lendholm’s name on it, because even though the partner might then have been irresponsible, he might afterwards in the course of time and events, have gotten property or money and been *194 compelled to pay his share of the debts. We concede that if Bailey’s theory be true, he could still have made Lendholm pay his share, but whether the bank had that right after they had surrendered the paper and taken other paper in place of it, is a very grave question; however this may be, it very conclusively demonstrates that the firm had dissolved. This condition of affairs is further supported by a letter written by Bailey in January, 1888, to Lendholm, in which he states an account between the parties, to wit, that Lendholm owes him $782.08, after his assumption of both notes at the bank of $2,122. In that letter he states that Lendholm is not charged up with any interest or any expense since the bill of sale on August 27th. He then proceeds quite elaborately to set out the situation. He says one note was for $1,500, on which there should be a credit because he sold fourteen steers at $410 and paid that amount on it, which left $1,122, and the other note for $1,000 would have to be raised by March 1st. He further states that on August 27th, there were fifty-five head of cattle and at $20.00 per head it would make $1,100, and as the note was $1,122, he thought he would assume it, as this one would offset the cattle. He then states what he paid Gebhart, and asks Lendholm to send him his note for one year at twelve per cent to pay his share of the indebtedness. This letter clearly indicates, so far as Bailey is concerned, that the firm was dissolved and at an end, and that it was his purpose or his understanding that the partnership should no longer carry on its affairs or do business as a concern. To this letter there was no response by Lendholm, the situation was accepted, and Lendholm permitted Bailey to act on the hypothesis, and on the theory, that he had a right to take this course and dispose of the cattle to pay one of the notes, and that he would still be indebted to him for one half of the balance which the firm owed. When that letter was received by Lendholm, and its receipt is not denied, it was incumbent on him, if he was unwilling that the matter should take this course, to speak, and his whole course as well'as his whole testimony indicates his acceptance *195 of the proposition and concurrence in the course which Bailey-had adopted. We simply refer to this to demonstrate that under all the authorities the partnership was dissolved in December, 1887. The business of the concern was done,— it was ended and wound up. The firm notes had been disposed of and were out of the way and represented by individual notes of Bailey. The cattle were left in Bailey’s hands and he had title to the whole of them, first, as to half by a partnership title, and as to the other by a bill of sale which was never questioned and is not to-day. The title, so far as Lendholm is concerned, was absolute because he made no objection to Bailey’s selling the cattle, and applying the proceeds on the debt which Bailey afterwards did. In the language of the books the partnership was dissolved because it had ceased to do the business for which it was organized, and they all agree that where two partners abandon business, and treat it as ended, it will work an absolute dissolution of the concern. Potter v. Tolbert, 113 Mich. 486; Blake v. Sweeting, 121 Ill. 67 ; Spurch v. Leonard, 9 Bradw. 174; Bank of Montreal v. Page, 98 Ill. 109 ; Ligare v. Peacock, 109 Ill. 94.
Under these authorities it is very clear there was an end put to the business, and that the partnership was dissolved. It is not true that the holding of the fifty-five head of cattle operated to continue the concern and prevent the dissolution. It has been well adjudged that the holding and sale of specific articles in no manner tends to revive a cause of action which has been barred because of a dissolution, neither does it tend to continue the concern. Currier v. Studley, 159 Mass. 17. Even if these principles were not true, and there are none to the contrary, it would still be certain that the statute would start to run from the time an account was stated between the parties. If the letter of January 10, 1888, is not a statement of an account as between the members of the firm, none was ever made out and sent. It is quite true the letter does not take the form of a merchandise account with debits on . one side and credits on the other in the regular *196 bookkeeping form, but in truth and in fact, it is an absolutely accurate and complete statement of the accounts between the partners and of the indebtedness which the firm owed and its credits, and of what was due from one partner to the other upon the winding up of the copartnership affairs. Under these circumstances it was an account statéd between them which starts the running of the statute. Boggs v. Johnson, 26 W. Va. 821.
There is a wide difference between the rights and remedies which inure to copartners for the enforcement of their respective obligations, and those which belong to individuals or different firms which have dealt with each other. With respect to the latter there is usually little question as to the date at which the statute of limitation commences to run. A totally different question is presented where a bill for an account is filed. The difference does not spring from the circumstance that in one case it may be a suit in equity and in the other an action at law because the former jurisdiction, in analogy to the rule which prevails in actions at law, adopts the general statute and wherever the suit is at law the action would be barred and held unenforcible in a court at chancery. We are quite cognizant of the fact that there is apparently a wide difference in the cases with respect to one proposition which this case presents. Many of the states very broadly hold that the statute runs from the date of dissolution regardless of what may afterwards happen. Others hold that where anything is done about the firm business with reference to either the disposition of assets or the collection of debts, it will operate to prevent the bar and that the statute only starts to run from the date of the last transaction. We proceed to cite the authorities which hold that it starts from the dissolution. Quayle v. Guild, 91 Ill. 378; Bonney v. Stoughton, 122 Ill. 536; Richardson v. Gregory, 126 Ill. 166 ; Arnett v. Finney, 41 N. J. Eq. 147; Wells v. Brown, 83 Ala. 161; Brewer v. Browne, 68 Ala. 210; Gray v. Kerr, 46 Ohio State, 652; Montgomery v. Montgomery, Rich. Cas. (S. Car.) 64.
*197 These authorities are cited as illustrative of the general rule which has prevailed in a great majority of the courts with reference to the bar of the statute in bills of account between partners. There are some cases to the contrary, although the weight and volume of authority and the prevailing doctrine is best set forth by these cases. While we have cited them, we do not acquiesce in the entire doctrine as therein stated. We believe that the true rule is to be found between the two lines of authorities. We do not believe that it absolutely starts at the time of the dissolution, although we believe it may start at that time, depending wholly upon the circumstances surrounding the matter. The house of lords holds that the statute starts to run whenever there is a dissolution, no matter what may be the ultimate result. The case in which this doctrine has been most recently announced in any case which has been called to our attention or which we have been able to find is Knox v. Gye, Lr. Rep. English & Irish Appeal Cases, vol. 5, 656. That case shows a dissolution of the firm, and the subsequent collection by what may be called the liquidating partner of a large sum of money in which the estate of a deceased partner would have been entitled to share had the action been brought in ample time. The house of lords announced the broad doctrine that the dissolution started the statute to run, and having run, the subsequent, collection in no manner either stopped it, revived the right to sue, or gave a cause of action to the other members of the firm or the representatives of the deceased partner. Lord Chancellor Hathaway, in what to me is a very persuasive opinion, held the contrary. The question afterwards came before the supreme court of the United States and that learned tribunal refused to declare the law to be that the statute begins to run on the dissolution of a copartnership irrespective of the circumstances of the particular case. That court cited a great many cases, in fact all the cases to which the appellee has called our attention, and more, and proceeded to declare the rule that the time when the right of action accrues, so as to set the statute in motion, *198 depends entirely upon the circumstances of the case. That court particularly said the start may be coincident with the dissolution of the copartnership, or it may be at some other time, dependent on the rights and equities of the partners, the condition of affairs and the condition of the firm business when the dissolution was agreed upon. Riddle v. Whitehall, 135 U. S. 621.
According to our notions this case expresses the true rule which ought to prevail when the question is whether the statute commences to run at the date of the dissolution or afterwards. We however conclude, as the record now stands, though we frankly confess it may be altered on the subsequent trial by further proof in the premises, the statute did commence to run at least as early as January, 1888, when a full account was stated between the partners, rendered by Bailey on one side and received by Lendholm on the other, without objection and without protest. Under the proof as it now is, the firm was dissolved in 1887. The firm had no assets. There were none to which it had even a semblance of claim save the little bunch of cattle then in the possession of Bailey, and to which he held a vested title, and it owed little unless it was obligated for the indebtedness represented by two notes which had apparently ceased to be co-partnership obligations because they had been taken up by Bailey with his own paper, and so far as the bank was concerned were discharged by the individual note of the one who might in a limited sense be called the liquidating partner. Bailey took up the firm notes and gave his own secured by Cochran. The bank accepted them in settlement. •Without determining whether the bank could ever have held the firm liable on the original indebtedness after this surrender, there were outstanding no notes of the firm save one small note held by Gebhart.. From this date, to wit, November or December, 1887, the firm practically owed nothing. Whatever may have been the state of accounts as between the copartners, the firm had no assets except fifty-five head of cattle, which as suggested, were held and owned *199 by Bailey. Lendholm could never question Bailey’s title even though we concede that the circumstances of the delivery of the bill of sales were correctly stated by Jeffries. According to that story Lendholm expected to get into difficulty and wanted to put the property out of his hands. If his purpose was fraudulent it would not lie in his mouth afterwards to question the validity of the bill by setting up his own purpose to perpetrate a fraud. The bill of sale was conclusive and Bailey had an absolute title to the cattle. The case then is by these circumstances brought within none of the authorities which hold that where there are both assets to be disposed of and debts to be paid, the firm will not be treated as dissolved and start the statute. The firm and the business for which the firm was organized was at an end. It had no assets, and unless the proof should be varied on the subsequent trial it owed nothing except the one Gebhart note, and why under any of the authorities the statute would not then begin to run we are unable to see. Our decision, of course, is wholly based on the record and the proof as it now stands. It may be entirely altered on the subsequent trial, and the court may determine from the evidence that Bailey had no intention to pay off the partnership debts or notes when he gave his own secured by Cochran to take them up. There may be an attempt to conclude the parties on the question. It is contended that this was done as a matter of convenient arrangement between the bank and Bailey and between Bailey and Lendholm, the latter being a consenting party, and possibly the proof may ultimately establish the fact, as the appellees now insist .that it was understood between Lendholm and Bailey that Lendholm should still be liable to the bank, and should ultimately contribute his due proportion to the payment of them when they fell due. Should the proof be broad enough in this direction it may satisfy the court that the business of the firm was not at an end, and that the statute therefore did not commence to run. We put in these saving clauses that the parties on the subsequent trial may not be concluded *200 from either offering proof or obtaining the judgment of the court on the testimony respecting the one pivotal question, which is did the firm cease to exist in January or before. We conclude it did from the present proof. As we look at it the case is squarely brought within one of the authorities which hold that where an account is stated between the co-partners, and it is unquestioned, the statute begins to run from the date of the account. In this case the evidence shows that this account was rendered in January, 1888, and on the 10th of January, more than six years before the suit was begun. Unless the court shall find from the proof that this account was not accepted by Lendholm, and that he was not silent in the premises, or that he rejected and refused to be bound by it, so that it cannot be taken as an account stated, as we now hold it to be under the present record, the statute of limitations would bar the present suit.
On the proof, we conclude the court erred in holding otherwise, and the judgment must consequently be reversed.

Reversed.