[No. 6410.]

## FARRELL v. THE GARFIELD MINING, MILLING AND SMELTING COMPANY.

1. **Contracts—Construction**—Every contract is to be taken a natural and reasonable sense, to be drawn from the whole of its provisions.— (165)

Where the language is vague or ambiguous, the conduct of the parties, and the construction which they have put upon it while engaged in its performance, and before controversy has arisen, is one of the most reliable tests of their intention.—(165)

Farrell and others entered into an agreement with Wysong and others for the sale of certain mining properties. Wysong and his associates were to organize a corporation to purchase, develop and operate the properties. The capital stock was to be one million dollars. The vendors were to receive a sum of money, in installments, and 490,000 shares of the stock; two hundred and fifty thousand shares were to be sold to raise the working capital, and two hundred and sixty thousand to pro-

vide means for meeting the payments to the vendors. The corporation as soon as organized was to assume possession of the mines, and extract and sell the ores therefrom, for its own use and benefit. Wysong and his associates were to meet the company's pay-roll, and guarantee its payment, so long as the contract remained in force. There was a provision that in case the production of the property should be sufficient to meet the installments of purchase money, or any part thereof, the vendors "are to receive dividends on 367,500 shares absolutely," but the dividends on the balance of the stock, not held by others than Wysong and his associates, "are to be applied upon said payments for said property, as rapidly as such dividends may accrue," and that Wysong and associates should not receive any part thereof, until full payment of the cash stipulated to be paid to the vendors. The company had been organized, all accrued installments of the purchase money had been paid, and nearly $100,000 had been expended in development. No dividends had been declared, but Farrell, as manager, having received a sum of money from the proceeds of the ore, retained the larger part of it, claiming that he and his associates were entitled thereto, under the provision quoted, as dividends on their stock. It was held that in view of the manifest unfairness to Wysong and associates, of this contention, its inconsistency with other provisions of the contract, and with the conduct of Farrell before the controversy arose, the word "dividends," in the clause quoted, must be taken in its ordinary sense, to-wit: "a division of profits, after the payment of expenses."—(161, 169)

2. **Appeals—Finding on Conflicting Evidence**—The conclusion of the court below, supported by sufficient evidence, will not be reviewed on appeal.—(165)

3. **Interest** allowed upon money unlawfully detained by an agent from his principal.—(164)

*Appeal from Chaffee District Court*—Hon. MORTON S. BAILEY, Judge.

Messrs. GOUDY & TWITCHELL and Mr. WALLACE SCHOOLFIELD for appellant.

Mr. C. A. CHAMBERLIN for appellee.

Mr. JUSTICE HILL delivered the opinion of the court:

Upon May 14, 1903, a contract was entered

into between John L. Farrell and C. H. Abbott,
of the first part; G. R. Wysong, J. H. Tribby and
Chas. Hamblen, of the second part. The appellee is
the successor in interest to the parties of the second
part.

The first parties were the owners of certain
properties consisting principally of lode mining
claims in the counties of Chaffee and Saguache.
The contract states that the parties of the second
part were desirous of organizing a company to pur-
chase said properties; it provides, in substance, that
the second parties would at once proceed to organize
and incorporate a company with a capital stock of
one million shares of the par value of $1.00 per
share, for the purposes of purchasing, operating and
developing said mining claims. The first parties
agreed to sell and convey said properties to the
company for $50,000 and 490,000 full paid up, non-
assessable shares of its capital stock. The shares
were to be issued and delivered upon its organiza-
tion, and the sum of $5,000.00 was to be paid on or
before July 1st, 1903; the remainder, in sums of
$5,000.00 each, at stated periods until the $50,000.00
was paid.

The first parties further agreed that, within
thirty days, they would make unto said company a
good and sufficient mining deed to the properties;
it was to be deposited in the First National Bank
of Salida, in escrow, to be delivered upon the pay-
ment or deposit of the $50,000 and the issuance and
delivery of the 490,000 shares, as aforesaid. It was
further provided that said deed was to remain in
escrow until such time as it should be delivered by
reason of the payment in full of the purchase price,
unless it was withdrawn by said first parties because
of the failure of the second parties to make said
payments or deposits or either of them, or to issue

(11)

or deliver the stock; but if the stock, or any part thereof, or the payments of $5,000.00 each, or any part of such payments, were not made at the times and in the manner specified, then the first parties could, at their option, declare the contract terminated and the privilege of purchasing forfeited, and could, at once, withdraw said deed from escrow, and in the event of so doing were to retain any and all payments or deposits theretofore made, as liquidated damages.

It was further agreed that the first parties were to be named in the articles of incorporation as two of the directors during the first year, and the 510,000 shares of the stock of the company remaining after the issuance of the 490,000 shares aforesaid, were to be disposed of as follows: 250,000 shares to be set apart as treasury stock to be sold and the proceeds used for the working and developing of said mining claims; the remaining 260,000 shares, or so much of the same as was necessary, were to be sold for the purpose of providing funds to be used in meeting the cash payments above mentioned; the balance of the 260,000 shares, if any such balance there was remaining after said payments, was to be issued and delivered to the second parties. Then followed the paragraph, the construction of which is the cause of this litigation; it reads as follows:

"In the event that there is a production from said mining claims sufficient to make the said payments, or any part thereof, the said parties of the first part are to receive dividends on 367,500 shares of said stock absolutely, but the dividends on the balance of the capital stock of said company, not purchased and held by parties other than the said parties of the second part, are to be applied upon the said payments for said property, as rapidly as such dividends may accrue, and the said parties of

the second part are not to receive any part thereof until the said sum of Fifty Thousand Dollars shall have been paid in full.''

It was further provided that, as soon as the purchase price was paid, the first parties were to pay the second parties $5,000 and to assign to them of their 490,000 shares of said stock twenty-five per cent., amounting to 122,500 shares.

It was further provided that five per cent. of the net earnings of said mines were to be set aside as a sinking fund, and any stock remaining in the treasury after the property was on a dividend-paying basis, was to be issued and distributed among the stockholders *pro rata,* according to the amount of stock held by each.

It was further provided that the company, as soon as incorporated, was to have the right and privilege of working said properties and extracting and selling ore therefrom for its own use and benefit; such right and privilege was to continue as long as the contract remained in force; but if default was made in any of the payments, or if the company failed to do a certain amount of work during each calendar month, in such case the right and privilege of working said mining claims was to be forfeited, and the same, together with the right to the exclusive possession of the property, was to revert to said first parties at once.

It was further agreed that the second parties were to take care of the company's pay-roll and guarantee its payment while the contract remained in force.

Under the provisions of this contract, the appellee, the Garfield Mining, Milling and Smelting Company, was incorporated and proceeded to work the properties. The appellant, John L. Farrell, acted as its superintendent for about two years,

and as such drew a salary; during this period he received in proceeds from the sale of ore shipped from the property $4,761.25, he deposited $808.77 of this amount to the credit of the appellee, the remainder, $3,952.48, he failed and refused to turn over, but retained the same under the claim that he and the heirs of Mr. Abbott (who has since become deceased) were entitled to a part of it as dividends upon their stock, and the remainder to apply upon the purchase price of the property, as provided for in the contract.

This action was brought by the appellee, plaintiff below, to recover this money. Trial was to the court, which found generally in favor of the plaintiff, appellee here, and gave judgment accordingly, which, including interest, was in the sum of $4,482.74, from which this appeal is prosecuted.

It was conceded at the trial that all of the $5,000.00 payments provided in the contract, that were then due, had been paid; that $35,000.00 of the $50,000.00 had thus been paid, leaving $15,000.00 yet to be paid, when the proper time came, with a rebate of $5,000.00 out of this to be returned to the second parties to the contract. Hence, this contention is limited to the construction of the contract upon the meaning of the word "dividends," and the right of Mr. Farrell and associate to have a part of this money applied as dividends upon their stock, and the remainder, upon the payments for the properties as rapidly as such dividends might accrue upon all stock not purchased and held by parties other than those to the contract. If this be true, then the further contention that Mr. Farrell, as agent and superintendent of the company, had no right to retain this money over the protest of his employers, no dividends having been declared by its Board of Directors.

Counsel for appellant have cited numerous authorities upon the construction of contracts, all of which have been given consideration, but none of which has convinced us that the court erred in its findings. We agree with counsel, that a contract should be construed according to the intent of the parties, gathered from its language, and by looking at all of the provisions of the instrument, and not one alone; that an agreement should receive a natural and reasonable construction; that, as a general rule, it is the duty of the court, where the language of a contract is indefinite or ambiguous, to adopt the construction and particular interpretation which the parties themselves have put upon it and to enforce that construction; and especially should this rule be followed where the execution of a contract involves a particular construction of it, and the minds of the parties agree upon it while they are engaged in its performance and before any controversy has arisen concerning its interpretation; this construction is one of the best indications of their true intent.

In this case, the evidence is conflicting upon the interpretation which the parties themselves placed upon the contract. The trial court, in placing its construction thereon, is consistent with the evidence upon behalf of one of the parties; the presumption must follow, that it accepted the truth of the evidence in support of the contention of that party, in which case, where the contract is ambiguous and uncertain and apparently conflicting in different paragraphs, and it is necessary to receive outside evidence to arrive at the real intention of the parties, and the court finds in harmony with the evidence introduced by one of the parties, it is not the province of this court to disturb such find-

ings where there is sufficient evidence to sustain them.

The case of *University v. The North Carolina Railroad Company,* 76 N. C. 103, cited by the appellant, upon the question of dividends, is not in point; for the reason that in that case there was a distribution in the shares of the estate of a deceased person, wherein the court said:

"Unless the word 'dividend' is restricted by its context to a particular subject, it will apply to and embrace many other estates and interests, with as much propriety as those of corporations and companies."

In this case the context clearly indicates the intention of the parties. This position is strengthened by the paragraph which reads:

"It is further understood and agreed by and between the parties aforesaid, that the said company, as soon as the same shall have been organized and incorporated, shall have the right and privilege of working the said mining claims and property and extracting and selling ore therefrom for its own use and benefit, such right and privilege to continue as long as this contract remains in force."

From this language, it must have been intended that the proceeds of ore shipped from the mines should become the property of the appellee. Such intention is further shown by a letter from Mr. Farrell to Mr. Wysong (one of the grantors of the appellee) wherein he asks what he should do with a check for $71.51, proceeds of the first shipment of ore; in the same letter he states that he deducts the hauling, $20.55, showing that he contemplated that before any dividends should be declared, the expense of hauling the ore should be deducted. This intention is further shown by the fact that he forwarded the proceeds of other ore shipments to the

company. In the case of *Eyster v. Centennial Board of Finance,* 94 U. S. at page 504, it is stated:

"The dividends declared by a corporation in business usually are, and, except under special circumstances, always should be, from profits. Hence, the word frequently carries with it the idea of a division of profits; but that is not necessarily its only meaning. Its special signification, in any particular case, is always dependent upon the character of the thing divided."

This dictum was upon the winding up of a corporation organized by an act of congress for the Centennial Board of Finance, in which case the court had previously stated:

"When a corporation is to be wound up, there is not, ordinarily, a necessity for an account of profits. After the liabilities are paid, the remaining assets belong to the stockholders, and all that need be done is to make the proper division. For that purpose, it is quite immaterial whether what remains is profit or capital. In either case, it belongs to the stockholders, and is to be distributed among them *pro rata.* Such a division produces a dividend, that is to say, a part or share of the thing divided. If the division is of profits, then the dividend is of profits; if of capital, then of capital."

In the case under consideration the corporation was not to be wound up and it was not so understood by any one concerned; but, to the contrary, it was expected that it would continue to the profit of all, so that ultimately, as shown in some of the letters of the appellant, it was anticipated that large dividends would be secured for all the stockholders. We think that the word "dividends," used in this contract, was intended as mentioned by the appellant in one of his letters to the appellee, that is, the net receipts or profits after the payment of all expenses

in the, operation of the plant. We do not find sufficient language in any of the other paragraphs to overcome this presumption. The fact that 250,000 shares of the stock were to be set apart as treasury stock to be sold and the proceeds used for working and developing the mining claims, does not show any intention that the gross proceeds from the ore should be used either in the way of dividends or upon the purchase price, but on the contrary, each provision was evidently made as a matter of precaution, this one to provide funds which would insure the working and developing of the claims, then undeveloped, in the hope of getting ore in paying quantities. It also provided that 260,000 shares, or so much of the same as might be necessary, was to be sold for the purpose of deriving funds to be used in making the cash payments, and it could be just as consistently urged that inasmuch as a fund was provided for the cash payments, that it could come from no other source. Another part of the contract which is against the contention of the appellant, is that portion which provides that the second parties to it "agree to take care of the company's pay-roll, and guarantee the payment thereof while the contract remains in force." This was only a guarantee upon the part of the contracting parties that the company, which they would organize, would take care of the pay-roll so that the property would not be liable to mechanics' and material men's liens, etc. The record shows that this part of the contract had been fulfilled; that the total value of the ore produced by the company was, as stated, $4,761.25, while the cost of improvements, development and production up to that time paid by the company (or the second parties to the contract who had guaranteed it) was from ninety-three to ninety-five thousand dollars. If the con-

tentions of the appellant are correct, in the event that there was a production of any material amount, say $75,000.00, between the time when the contract was made and the time when Mr. Farrell severed his connection with the company, the appellee, or the second parties to the contract, would have to bear all the expense of the production and yet give $36\frac{3}{4}$ per cent. of the gross proceeds to the first parties, as dividends, and allow the other $63\frac{1}{4}$ per cent., or the portion thereof represented by stock not sold to outsiders, to be applied as a payment upon the property; indirectly giving a much greater price for the property than called for by the contract, before they would be entitled to receive anything upon their stock or have it stand upon an equality with the stock held by the appellant and his associate. Another reason why it was not intended that this money should be used as dividends is the effect it would have upon other stock sold to outside parties. It will be noted, it was provided that the sale of certain stock was to be made to pay running expenses, other stock was to be sold and the proceeds used in the payment of the purchase price; yet, according to the contention of the appellant, the company would sell stock to pay running expenses, also to pay for the property, and yet declare dividends of all proceeds received, regardless of the fact that the mine was being run at a loss. From the language of the contract, in the light of the surrounding circumstances, we conclude that it was the intention of the parties at the time of its execution that the word "dividends," as used therein, was intended to be taken in its usual and ordinary meaning, to-wit, a division of profits after the payment of expenses.

This disposition of the principal question makes unnecessary any ruling upon the right of Mr. Farrell,

as superintendent, to retain the money, over the protest of his employers.

Other assignments have been considered.

Perceiving no prejudicial error, the judgment is affirmed.                                    *Affirmed.*

CHIEF JUSTICE CAMPBELL and Mr. JUSTICE GABBERT concur.