[No. 3935.]

RUTH ET AL. v. FLYNN, ADMINISTRATOR.

1. EVIDENCE—*Presumptions.* Each of the members of a partnership took out a policy of insurance upon his life, in favor of the firm. It was presumed that the two were in similar terms. (172)

2. LIFE INSURANCE—*Insurable Interest.* The partnership has an insurable interest in the life of each partner; but upon the dissolution of the firm such interest terminates. (181)

3. —— *Construction of Policy.* A policy of insurance upon the life of one of the members of a partnership named the firm as the beneficiary, with the addition "or if the insured survives the aforesaid beneficiary, to the administrators of the insured." *Held,* that upon the dissolution of the partnership the personal representative of the insured partner was, *ipso facto,* substituted as the beneficiary in the policy. (178)

4. PARTNERSHIP—*Dissolution—Partnership at Will.* A partnership at will may be dissolved by either partner, at his pleasure, at any moment. The mere withdrawal is, in law and in fact, a dissolution. (178)

Two partners entered into an agreement of dissolution. One was made the trustee, for "winding up the affairs of the dissolved partnership;" the authority of the other to check against the bank account was revoked; an arbitrator was appointed to adjust their differences; and each partner engaged in business on his own account, taking on no new business on account of the firm. The agreement provided that certain contracts previously taken by the firm should be "completed by both parties * * * exactly as if the partnership was still existing." *Held,* that the firm was dissolved at the date of this agreement. *Held further,* that, no creditor of the firm having, so far as appeared, any notice of the execution of the policy of insurance on the life of one of the partners, subsequently deceased, nor having extended any credit on the face of such policy, the surviving partner should not be heard to assert, as the representative of creditors, a claim for the insurance money; but that, in the adjustment of the partnership affairs he would be entitled to credit for premiums which he had paid upon the policy. (178, 180, 181)

5. CONTRACTS—*Construction.* An ambiguous agreement is to be construed in the light of the subsequent conduct of the parties. (179)

*Error to Denver District Court.* HON. CARLTON M. BLISS, Judge.

MESSRS. CRUMP & ALLEN for plaintiffs in error.

MR. JOHN H. REDDIN for defendant in error.

CUNNINGHAM, P. J.

The facts involved in this case, and which are necessary to its proper determination, present some interesting questions. We have been able to find but one or two cases that seem to be parallel in all respects. To these we will refer later. A rather full statement of the facts will materially shorten the opinion. Joseph P. Ruth and John T. Flynn, some time prior to February 24, 1909, formed a partnership under the firm name and style of The Ruth-Flynn Construction Company. On September 30, 1908, each member of this firm took out an insurance policy on his life in the sum of $5,000. These policies (at least Flynn's policy, and we presume they were alike) contained the following provision:

"The Capitol Life Insurance Company of Colorado, by this policy of insurance, agrees to pay the sum of $5,000 at its home office in the city of Denver, immediately after the acceptance of satisfactory proof of the fact and cause of the.

death of ——————— (the assured) * * * to The Ruth-Flynn Construction Company, with the right of revocation, *or if the insured survive the aforesaid beneficiary*, to the administrators, executors or assigns of the insured."

The policy was made on the application of Flynn himself, and recites that the premium was paid in advance, but the evidence shows that it was paid by a promissory note due six months after date, said note being signed by The Ruth-Flynn Construction Company, and Joseph P. Ruth, and included the amount due as premium on both policies, that is, the policy of Ruth, as well as the policy of Flynn. This note was paid by Ruth immediately after Flynn's death, but some seven months after its maturity. At the time Ruth paid the note, he knew that Flynn was dead, or at least he had been so informed. Flynn died on August 27, 1909. On February 24, 1909, about five months after the policy had been taken out, and about six months before Flynn's death, Flynn and Ruth entered into a written agreement touching the dissolution of the partnership. As we view it, the paramount question involved in this case is, whether the parties to this agreement intended to, and did in fact, terminate and dissolve the partnership at the time of this agreement, so as to substitute for The Ruth-Flynn Construction Company as the beneficiary named in his insurance policy, Flynn's administrator. We shall, therefore, set forth at some length the salient features of the aforesaid dissolution agreement. The introductory portion of the agreement is as follows:

"This agreement, entered into this 24th day of February, A. D. 1909, * * * between John T. Flynn and Joseph P. Ruth, witnesseth as follows:

That whereas John T. Flynn and Joseph P. Ruth have heretofore conducted and are now conducting a partnership under the name of The Ruth-Flynn Construction Company, and,

Whereas, they are desirous of dissolving said partnership;

Now therefore, it is hereby agreed by and between the partners mentioned: that in consideration of the sum of one dollar, the receipt of which is hereby acknowledged, and in consideration of the covenants and agreements hereinafter to be mentioned, and for other good and valuable consideration;

That the said partnership is hereby dissolved by mutual consent.

That the terms of dissolution of the partnership are as follows, and the winding up of the affairs of the partnership shall be conducted as follows:"

Then follows twelve paragraphs or provisions, the first providing that four incompleted pieces of work or contracts which the company held,

"Shall be completed by both parties in a similar manner and on a similar footing and exactly as if the partnership were still existing."

These jobs or contracts are then described. The second paragraph provides that the existing debts and debts to be incurred in the finishing of the four jobs mentioned in the preceding paragraph,

"Shall be paid by the firm as heretofore; that each partner shall contribute thereto exactly as done heretofore."

The third paragraph provides for the collection of amounts due the firm. The fourth paragraph reads:

"That money so collected shall be deposited in the bank account of the partnership as heretofore."

The fifth paragraph reads:

"That all the debts shall be paid from the bank account as heretofore in the regular order of business."

The sixth paragraph provides for equalizing accounts between the partners, and provides further:

"That from this day on none of the partners shall be permitted to draw out any money."

The seventh paragraph provides for the division of the partnership assets. The eighth paragraph, which we quote in full, reads as follows:

"That Joseph P. Ruth shall be entitled to the entire business and everything connected therewith, the name of the firm, and the good-will, and all the property, either personal or not personal, tangible or intangible, present or prospective, and that such property so enumerated shall become the sole property of Joseph P. Ruth."

The next paragraph provides that Ruth shall pay to Flynn $1,800, upon the completion of all the transactions mentioned in the contract, and the complete settlement of the business affairs, that is, as we understand it, after the accounts between the partners had been fully settled, Ruth was to pay Flynn $1,800 for his interest in the business, including the good-will. Paragraph ten reads:

"That both parties hereby agree to and appoint and constitute John B. Giejsbeek as arbitrator of any difference which may arise."

The eleventh paragraph provides for the payment by Ruth to Flynn of $50 on the $1,800 item, the said $50, however, being paid to the arbitrator, Geijsbeek, as trustee, to be held until the other provisions of the contract had been performed, and paid to Flynn in the event they were performed, but returned to Ruth if Flynn should fail to peform his part of the agreement, and Geijsbeek was made the sole judge as to whether the terms of the agreement were or were not properly carried out. The twelfth paragraph reads as follows:

"That the said Joseph P. Ruth, by virtue of his being the continuing partner, and in accordance with the law, is hereby appointed by Flynn as the sole partner and trustee for the winding up of the affairs of the dissolved partnership."

This agreement was duly signed by Flynn and Ruth, and witnessed by Geijsbeek. On the same day that this agreement was signed, Flynn and Ruth addressed a letter to the Central National Bank of Denver, where, presumably the funds of the partnership were on deposit, reading as follows:

"Gentlemen:

We hereby inform you that we have this day dissolved the partnership heretofore conducted under the name of The Ruth-Flynn Construction Company. That Mr. John T. Flynn is to retire from the business, and that the business is to be conducted by Mr. Joseph P. Ruth alone. Mr. John T. Flynn's signature is therefore revoked from this day at the beginning of business."

And at the same time Ruth and Flynn caused the following notice to be inserted and published for thirty days in a Denver paper:

"Notice is hereby given that the partnership heretofore conducted under the name of The Ruth-Flynn Construction Company has been dissolved, commencing February 24, A. D. 1909, and Joseph P. Ruth is hereby constituted trustee for the winding up of the business."

The evidence introduced on the trial does not show that there was any partnership business transacted after February 24th, except in connection with the completion of the four jobs mentioned in the agreement, and several months before Flynn's death Ruth was working in Arizona and Old Mexico, on contracts taken in his own name, or at least, contracts taken after the dissolution of the partnership, in which Flynn had no interest, and apparently Flynn was conducting business prior to his death in which Ruth had no interest. On the death of Flynn the Insurance Company filed a petition in the District Court in which it set up the issuance of the policy, the death of Flynn, and the contention that had arisen between Bart Flynn, the administrator of John T. Flynn's estate, and Joseph P. Ruth, touching the distribution of the proceeds of the policy, admitting its liability for the payment of $5,000, and praying an order of the court requiring the said Flynn and the said Ruth to come into court and interplead, and further asking authority to pay the $5,000 into the registry of the court funds. This petition was granted by the court, and Bart Flynn, the administrator, and Joseph P.

Ruth filed petitions in the case, each claiming the proceeds of the policy. Judgment finally went in favor of the administrator, from which judgment the case is here for review by writ of error.

Apparently the policy, at the time of Flynn's death, was in his possession. Geijsbeek, the arbitrator, was a certified accountant, and had had charge of the books of the company prior to and after the dissolution agreement to which we have referred; he officiated in the capacity of bookkeeper and arbitrator until June 21, 1909—four months after the date of the dissolution agreement and two months before Flynn's death—when he turned the books over to Mrs. Ruth, Ruth, apparently, at the time, being in Arizona or Old Mexico. Nothing was ever said to Geijsbeek by either of the partners concerning the life insurance policy that each of them had taken out in favor of the partnership, nor was the note given for the payment of the premium on these policies ever mentioned to him, and he had no knowledge that there was any such insurance until after the death of Flynn, when he was advised concerning the same by the agent of the insurance company. According to the testimony of Geijsbeek, which was not contradicted, he found the gross indebtedness of the firm to be $1,249.98. The uncollected sums due the partnership would reduce this amount to $684.50. If all the outstanding bills due the firm were uncollectible, still Flynn would owe the firm but a little over $600; that is, he would be required to contribute a little over that sum to meet his half of the gross indebtedness, besides which he was indebted on an overdraft to the firm in the sum of $103.74, so that his total liabilities, if Ruth had performed his part, would have been but little over $700, if no part of the amount due the firm had been collected; if all the outstanding bills were collectible, then Flynn's actual liabilities to the firm would have been reduced almost $300, leaving something over $400 justly due from him to the firm. In this connection it must be remembered that Ruth, by the agreement, owed Flynn

$1,800 as the purchase price of his, Flynn's, interest in the business. Taking all these figures together, Geijsbeek, who, as we have seen, was made the sole arbitrator, and who was an expert accountant, found, and so testified, that Ruth justly owed to Flynn $1,405.88. Flynn attempted to collect this amount from Ruth, and Geijsbeek proposed different methods in order to bring about an amicable settlement between the partners. Finally, Ruth wrote from Old Mexico, authorizing Flynn to make settlement with his wife, Mrs. Ruth, and she offered Flynn $750 in settlement, but this he declined to accept. We think these figures are not particularly important, in the view we take of this case, but we shall allude to them later, in connection with certain contentions with reference to the rights of creditors.

1. If the partnership was in fact dissolved on February 24, or at any time prior to Flynn's death, for that matter, then the representative of his estate was, by the terms of his policy, *ipso facto,* substituted as beneficiary for The Ruth-Flynn Construction Company. Counsel for Ruth contends the partnership was not dissolved, and bases his contention upon the fact that there had not been a complete settling or winding up of the affairs of the partnership. The authorities do not support this contention. So far as disclosed by the record this was a partnership at will, and therefore, might be terminated at any moment, at the pleasure of either of the partners.—Burdick on Partnership, (2nd ed.), p. 346.

That it was the intention of the partners to dissolve the partnership on the 24th day of February, 1909, is clear, (their subsequent conduct was sufficient to have worked a dissolution had no such agreement been entered into) for, as we have pointed out (a) Flynn's authority to draw checks on the bank was revoked; (b) Ruth, by the agreement, was made the sole partner and trustee "for the winding up of the affairs of the dissolved partnership;" (c) they appointed an arbitrator and attempted to confer upon him sole power to adjust their dif-

ferences, and finally (d) each party engaged in business on his own account, taking no new firm business whatever after the time of the dissolution agreement.

"In reality, according to the evidence as it now stands, both the parties abandoned the co-partnership and quit it, and ceased to do business together as a firm."—*Lendholm v. Bailey*, 16 Colo. App. 193, 64 Pac. 586.

As was said in that case, under similar circumstances, the letters from Ruth to Flynn clearly indicated that, so far as Ruth was concerned, the firm was dissolved and at an end, and it was his purpose or his understanding that the partnership should no longer carry on its affairs or do business as a concern.

"In the language of the books the partnership was dissolved because it had ceased to do the business for which it was organized, and they all agree that where two partners abandon business, and treat it as ended, it will work an absolute dissolution of the concern." Citing cases. "Under these authorities it is very clear that there was an end put to the business and that the partnership was dissolved. It is not true that the holding of the fifty-five head of cattle operated to continue the concern and prevent the dissolution. It has been well adjudged that the holding and sale of specific articles in no manner tends to revive a cause of action which has been barred because of dissolution, neither does it tend to continue the concern."—*Lindholm v. Bailey, supra.*

In *Blake v. Sweeting*, 121 Ill. 67, 12 N. E. 67, it is ruled that a partnership, when not formed for any definite time, may be terminated by any member of the firm at his pleasure. The withdrawal of one of the members of the firm, in fact and in law, is a dissolution of the firm. In the *Blake* case there was no written notice of dissolution published or given, but simply an abandonment by one of the members of the firm, who advised his associates by letter that he had no money, and they might settle the firm business as they pleased. More than six years after this abandonment one of the mem-

bers of the firm filed a bill to effect a settlement of the co-partnership, and the court held, the plea of the statute of limitations to this bill good. In *Bank of Montreal v. Page,* 98 Ill. 109, it is said:

"It is true, after dissolution, a 'kind of community of interest, of power and liability,' as between the original partners, continues—but this is only for the purpose of closing up or 'winding up' the affairs of the partnership.'"

From *Hamilton v. Smith,* 120 Ia. 93, 94 N. W. 268, we quote the following:

"A dissolution of a partnership does not necessarily involve the disposition of its property, nor a settlement between partners. The power to wind up its business, settle its accounts, and distribute the assets continues, after dissolution."

To the same effect is *Gilmore v. Ham,* 142 N. Y. 1, 36 N. E. 826, 40 Am. St. Rep. 544. See, also, *Quale v. Guild,* 91 Ill. 378; *Ligare v. Peacock,* 109 Ill. 99; *Potter v. Tolbert,* 113 Mich. 486, 71 N. W. 849; *Brewer v. Browne,* 68 Ala. 210; *Gray v. Kerr,* 46 Ohio St. 652, 23 N. E. 136; *Montgomery v. Montgomery,* Rich. Eq. Cas. (S. C.) 64; *Bonney v. Stoughton,* 122 Ill. 536, 13 N. E. 833; *Richardson v. Gregory,* 126 Ill. 166, 18 N. E. 777; *Arnett v. Finney,* 41 N. J. Eq. 147, 3 Atl. 696; *Wells v. Brown,* 83 Ala. 161, 3 South. 439.

Under the facts as proven, and the authorities here cited, we entertain no doubt that the partnership between Ruth and Flynn was dissolved and terminated on February 24, 1909.

2. Some contention is made that the policy of insurance was taken out for the benefit of creditors, and that the rights of these creditors required that the policy should be paid to the surviving partner, rather than to the administrator. There are several answers that appear to us sufficient to dispose of this contention:

First, the creditors of the co-partnership are not here complaining; second, there is no evidence that the creditors of the co-partnership extended credit upon the faith of this

policy, or, indeed, that they ever had knowledge of its existence. (A most interesting and thoroughly briefed case involving the right of creditors in a life insurance policy is that of *Keckley v. Glass Co.*, 86 Ohio St. 213, 99 N. E. 299); third, if the creditors had notice of the existence of the policy, it must be assumed they knew there was no obligation resting on Flynn, or upon the partnership, to continue it in force, and that Flynn might at any time lawfully change the beneficiary by substitution, while either partner might, at will, work a change by electing to terminate the partnership; fourth, there is no evidence in the record that the estate of John T. Flynn is insolvent, and if it is not, creditors, of course, may look to the proceeds of this policy, as well as to any other assets of said estate, if it becomes necessary for them to do so in order to collect what is due them from the partnership. The attempt of Ruth to invoke in this case the rights of creditors of the partnership would come with more force if he were not indebted to Flynn in a sum exceeding the gross liability of the partnership.

3. We have assumed, for the purposes of this case, that the partnership had an insurable interest in Flynn's life, and that the policy, when taken out, was valid. We agree with counsel for plaintiff in error that the weight of authority supports this view. This doctrine, however, as appears from most of the cases relied upon by plaintiff in error and cited and quoted from in his brief, is predicated upon the theory that when one member of a partnership dies, the concern loses his skill, his knowledge and experience in the business, as well as his constant efforts in its upbuilding, and therefore, his life is a source of much benefit to the co-partnership. See:

*Con. Mutual Life Ins. Co. v. Luchs*, 108 U. S. 505, 2 Sup. Ct. 949, 27 L. Ed. 800; *Warnock v. Davis*, 104 U. S. 775, 779, 26 L. Ed. 924; *Morrell v. Trenton Mut. L. & F. Ins. Co.*, 10 Cush. (Mass.) 287, 57 Am. Dec. 92; *Bevin v. Ins. Co.*, 23 Conn. 251; *Lord v. Dall*, 12 Mass. 115, 7 Am. Dec. 38; *Trenton Ins. Co. v. Johnson*, 24 N. J. Law 576.

But these cases are not in point here, because, at the time of Flynn's death, the partnership theretofore existing between him and Ruth was not interested in his life. He had long before that event ceased to work for the partnership. His former partner was, indeed, indebted to him, and he had been unable to collect what was justly due him from Ruth It was not understood by anyone that Flynn would continue to work in the interest of the partnership, or that it was his duty to do so. In *Cheeves v. Anders, Administrator,* 87 Tex. 287, 28 S. W. 274, it is ruled that the interest in a policy upon one member of a partnership, held by the firm, ceased upon the dissolution of such firm, and the survivor has no interest in the recovery. See *Bank of Macon v. Loh,* 104 Ga. 446, 44 L. R. A. 372. Of course in the settlement of the affairs of the partnership. Ruth will be entitled to credit for the sum which he paid as premium on the Flynn policy.

There are other matters considered in the brief which we think it is not necessary that we should discuss, though the same have received our careful attention.

The judgment of the trial court is affirmed.

HURLBUT, J., dissenting.

KING, J., specially concurring:

While agreeing with the conclusion reached by the majority of the court, and in no way dissenting from the reasons given by the Presiding Judge for such conclusion, I wish to state the reason which most strongly appeals to me. The agreement for dissolution of partnership may be regarded as, and conceded to be, ambiguous. In some of its provisions it is an unequivocal dissolution as of its date; in others it appears to be a present agreement for a dissolution in the future. As a whole, I regard it as more strongly indicating an intention to effect an immediate dissolution, than a dissolution to take place in the future; but because of such ambiguity, the agreement may, and, in my opinion, should, be construed in accordance with the well recognized canon of construction frequently applied to such contracts, that the parties to an

ambiguous contract are bound by the practical interpretation which they themselves give it.

"A construction of a contract adopted and acted upon by both parties will be regarded as worked into the contract," adapted from Wharton on Contracts, vol. 1, section 206, and is followed in *Union Pac. R. Co. v. Anderson,* 11 Colo. 293, 18 Pac. 24; *McPhee v. Young,* 13 Colo. 80, 87, 21 Pac. 1014, 1016; *Farrell v. Garfield M. M. & S. Co.,* 49 Colo. 159, 111 Pac. 839; *Fearnley v. Fearnley,* 44 Colo. 417, 98 Pac. 819; *Bullock v. Lewis,* 22 Colo. App. 449, 125 Pac. 849; *Animas Consol D'. Co. v. Smallwood,* 22 Colo. App. 476, 485, 125 Pac. 594, 596. I quote from some of said decisions, as follows:

"Thus far only the instrument itself has been considered. If, however, the intent and meaning of the parties is not clearly disclosed by the language of the contract, then competent evidence bearing upon the construction given to the instrument by the parties themselves, by their acts and conduct in its performance, may be considered."—*McPhee v. Young, supra.*

"Where the language is vague or ambiguous, the conduct of the parties, and the construction which they have put upon it while engaged in its performance, and before controversy has arisen, is one of the most reliable tests of their intention."—*Farrell v. Garfield M. M. & S. Co., supra.*

"The best indication of the true intent of the parties to a contract is the practical interpretation given by the parties while engaged in the performance of it and before any controversy has arisen."—Scott, P. J., in *Animas Consol. D. Co. v. Smallwood, supra.*

The extent to which this rule is enforced is evidenced by the following excerpt from *Reissner v. Oxley,* 80 Ind. 580, 584:

"The right of the parties to put an interpretation upon their own contracts, even to the extent of doing away, practically, with the ordinary and plain meaning of terms, can

not well be denied, so long as their interpretation does not result in a contract which for some reason is in itself unlawful. And the cases are numerous and consistent, which permit a resort to proof of the circumstances or situation of the parties, when their contract was made, and of their transactions under it, when its terms are of doubtful or ambiguous meaning, for the purpose of arriving at the true intention."

The interpretation which the partners placed upon this contract is clearly disclosed in their published notice of dissolution, and their letter to the bank (both of which are quoted in the main opinion), in one of which it was stated, "We have this day dissolved the partnership heretofore conducted," etc., and in the other, that "the partnership heretofore conducted under the name of The Ruth-Flynn Construction Company has been dissolved," and that the authority of the retiring partner was revoked. It is true that by the agreement, certain uncompleted contracts were to be finished by the persons who had theretofore been partners, but this obligation would have rested on each of them as to third parties, without regard to the dissolution of the partnership; and this agreement to perform certain specific obligations did not tend to continue the partnership.—*Lendholm v. Bailey*, 16 Colo. App. 190, 195, 64 Pac. 586; and, as well stated by the Presiding Judge in the majority opinion in the case at bar, in other respects the former co-partners, after the agreement, acted as they would have acted if they had regarded the partnership as ended, until, subsequent to the death of Flynn, the controversy arose as to the insurance policy.

Because of the practical construction which the parties placed upon their agreement, I regard their intention as conclusively settled in favor of the theory insisted upon by the administrator, and the continuing partner should be now estopped from asserting any other construction.