## WOLFF v. HELBIG.

1. CONTRACTS—CONSTRUCTION.

Contracts, oral and written, must be so construed as to ascertain and carry out the true intent and meaning of the contracting parties.

2. SAME.

The best construction is that which is made by viewing the subject of the contract as the mass of mankind would view it.

3. SAME.

Such a construction should be put upon a written agreement as would be at once reasonable, just and equitable to the parties, if such can be reasonably deduced from the instrument.

*Appeal from the District Court of Arapahoe County.*

THIS suit was instituted in the district court by John W. Helbig against Hiram G. Wolff.

There are three separate and distinct causes of action set forth in the complaint, and of these the first consists of three separate items, for which damages are claimed. As to two of these items the plaintiff suffered a nonsuit at the trial, leaving only what is termed the "Calhoun deal" remaining in the first cause of action.

The second cause of action relates to a small advance of money, alleged to have been at the instance and request of the plaintiff, and paid for the costs of filing a certain plat.

The third account is in the nature of an action of slander, for words spoken by the defendant of and to the plaintiff during certain negotiations with reference to what is denominated as the "Calhoun deal." The second and third causes of action were resolved by the jury in defendant's favor, and for this reason will not be more particularly described.

Only the issues joined upon the Calhoun item set forth in the first cause of action were resolved in favor of plaintiff, and consequently the only matter in dispute at this time arises from that transaction. The contract which is the basis of the complaint reads as follows :

"This agreement, made this 13th day of April, A. D. 1889, by and between Hiram G. Wolff, of Denver, Colorado, of the first part, and John W. Helbig, of Denver, Colorado, of the second part, witnesseth,

"That whereas, Hiram G. Wolff is the owner of the northwest quarter of the northeast quarter of the northeast quarter of section thirty (30), township three (3) south, range sixty-eight (68) west, and has this day agreed to sell the second party, John W. Helbig, the same in form and manner hereinafter set forth.

"Now, therefore, the first party agrees with second party,

"1st. That he will remove, or cause to be removed, within thirty (30) days from the signing of this instrument, the Rocky Mountain Ditch as now located through said land to the outside of the sidewalk on the east side of Sterling avenue, and that he will fill in the old line of said ditch as soon as water is turned in the new channel.

"2nd. That he will pipe under the ground within sixty (60) days from the signing of this instrument, the flume now in Wolff avenue, within the boundaries of the land above mentioned.

"3rd. That he will properly grade said land and the streets of the same as platted within ten (10) days after the signing of this instrument.

"4th. That he will survey and plat said land within ten (10) days, and file the plat thereof in manner as following : In two (2) blocks of forty-eight (48) lots each; lots to be not less than twenty-five (25) feet in width, by one hundred and twenty-five (125) feet in length; lots to face east and west with alley sixteen (16) feet wide through east block north and south; with a street entirely around east block of thirty (30) feet in width.

"5th. That he will on request of second party join in signing warranty deeds to the above mentioned lots except as hereafter mentioned, on the following conditions: *The purchaser shall pay at least one third of purchase.price in cash;* the balance to be paid in notes running to Hiram G. Wolff, secured by trust deed on the property conveyed to George Stidger, his trustee; said notes to bear interest at the rate of eight (8) per cent per annum, interest payable semiannually; said notes to be made for not less than one half of balance of said purchase price in not more than one year, and not more than one half of balance of said purchase price in not more than two years.

"Now in consideration of the above agreements, second party agrees to pay the first party the sum of twenty thousand (20,000.00) dollars, as follows: the sum of thirty-seven hundred and fifty (3750) dollars on the signing of this instrument, the receipt of which is here acknowledged; the sum of two thousand (2,000) dollars in ninety (90) days; the sum of two thousand (2,000) dollars in six (6) months; the sum of three thousand (3,000) dollars in nine (9) months; the sum of three thousand (3,000) dollars in twelve (12) months; the sum of sixty-two hundred and fifty (6250) dollars in fifteen (15) months.

"And second party agrees to execute notes for the above mentioned payments on the day of the filing of the plat of said property. Said notes to bear interest at the rate of eight (8) per cent. per annum with interest due at maturity. And it is agreed that each and all of said deferred payments shall at all times be a lien on the part of said land uncon veyed by first party, until each and all of said notes shall be fully paid.

"Second party agrees that he will pay all taxes and assessments levied against said property during the continuance of this contract.

"And it is mutually agreed, that when first party shall make deed to lot or lots as mentioned above that the cash payment, *less five per cent* of the full purchase price together

with the notes as above set forth, be given to Hiram G. Wolff, and that the account thus delivered to Hiram G. Wolff shall be credited first, on the note due in ninety days, until the same shall be fully paid; second, on the note due in six months, until the same shall be fully paid; third, on the note due in nine months, until the same shall be fully paid; fourth, on note due in twelve months, until the same shall be fully paid; and fifth, on the note due in fifteen months, until the same shall be fully paid. And when each and all of said notes shall be fully paid, Hiram G. Wolff agrees to make a warranty deed to his interest in all of said lots remaining unsold, to John W. Helbig, or to such person or persons as he may designate.

" And second party agrees that he will not sell or dispose of any of said lots for a less sum than two hundred and twenty-five (225) dollars each. And it is here agreed that first party shall not be bound to sign a deed to any lot or lots where the actual consideration is less than the sum just mentioned.

"And to the faithful performance of these covenants the parties hereto bind themselves, their heirs, executors, administrators and assigns.

" Witness our hands and seals this 13th day of April, A. D. 1889."

This agreement was afterwards supplemented by others, whereby Helbig agreed to release Wolff from certain claims for damages, the former consenting to extend the time six months on the Helbig notes remaining unpaid, and the defendant also agreeing to do certain grading. By one of these supplemental agreements, *the commission to be retained by Helbig from sales was increased from five to ten per cent.*

A demurrer to the complaint was overruled, and thereafter an answer and replication were filed. At the conclusion of the evidence offered for the plaintiff, a motion for a nonsuit was interposed and overruled. The trial resulted in a verdict and judgment against the defendant for $10,196.87

upon the Calhoun transaction, and from this judgment the defendant prosecutes this appeal.

Messrs. THOMAS & THOMAS and Mr. V. A. ELLIOTT, for appellant.

Mr. CHAS. M. BICE, Mr. A. B. SEAMAN and Mr. J. C. HELM, for appellee.

CHIEF JUSTICE HAYT delivered the opinion of the court.

The contract provides for the sale of ten acres of land, which land was to be divided into ninety-six lots, the purchaser, Helbig, agreeing to pay therefor twenty thousand dollars. Of this amount three thousand seven hundred and fifty dollars was to be paid in cash, and for the balance notes secured upon the land were to be executed by Helbig to Wolff. This cash payment was made, and the notes were duly executed and delivered with security, as provided in the agreement.

By the terms of the contract Helbig, at his option, might sell lots and substitute the cash and notes received upon such sales, and receive credit therefor upon his notes held by Wolff. In the sale of lots Helbig was limited to a minimum price of $225 per lot, but the contract fixes no maximum price. The sales were to be made upon the following terms: One third cash, one third in one year, and one third in two years. For the deferred payments and interest thereon the purchasers were to execute notes to Wolff secured upon the lots sold.

It is alleged in the complaint that on the 11th day of April, 1891, there was a balance due upon the face of the notes given by Helbig of $10,635.13, from which sum the plaintiff was entitled to a reduction of ten per cent commission, leaving a balance of $9,571.62 as the amount actually due defendant; that about this time the plaintiff procured a purchaser, named William C. Calhoun, willing to buy lots 25

to 44 inclusive, in block 2, for the full purchase price of
$10,635.13, on the terms and conditions set forth in the con-
tract between the plaintiff and the defendant,—the terms
offered being $3,545.05 in cash, less the ten per cent of the
full purchase price as provided in the amended contract, to-
wit, $2,481.53 in cash and two notes of $3,545.05 each, paya-
ble in one and two years respectively, bearing interest at
the rate of eight per cent per annum, interest payable semi-
annually, the notes being secured by trust deed on the
twenty lots to be conveyed. It is also alleged that the pur-
chaser executed the trust deed and notes as provided in the
contract, and the plaintiff and purchaser offered and tendered
to defendant in lawful money the cash and notes, together
with the trust deed, at the time requesting the defendant to
join the plaintiff in executing a warranty deed to the pur-
chaser for the twenty lots; that the defendant willfully and
without cause refused to execute or join in signing the war-
ranty deed tendered, or to accept the cash, notes and trust
deed, or either of them, and refused to give the plaintiff the
credit of $9,571.62, or any portion thereof on his notes; that
the defendant refused to have anything to do with the trans-
action, and that he ever since has refused to carry out his
part of the contract. As to these lots plaintiff alleges that
by the wrongful conduct of defendant he has been damaged
in the sum of $10,635.10.

The answer of the defendant admits the execution of the
contracts described in the complaint; denies that the defend-
ant has failed or refused to perform the covenants or stipu-
lations on his part as required. He denies that plaintiff
procured a purchaser, who was able or willing to buy lots
25 to 44 inclusive, in block 2, for the sum stated in the com-
plaint, or for any sum.

He alleges that Calhoun was a pretended purchaser, with-
out any means whatever; that the price at which plaintiff
pretended to have sold him these lots was a fictitious price,
far in excess of their real value, and that plaintiff sought to
induce the defendant to take a deed of trust back on these

lots far in excess of their real value, thereby causing him to release his lien which he held on the remaining lots for the purchase price of the same; that the transaction which the plaintiff desired him to carry out was not within the contract contemplated by the agreement.

The replication denied all the new matter set up in the answer. The plaintiff also says that *Hiram G. Wolff, the defendant, was ready and willing to carry out the sale to Calhoun until he was informed that the plaintiff was advancing the money to the purchaser, when the defendant refused to proceed any further therewith.* The plaintiff further alleges in the replication that at the time of making said original contract it was understood and agreed by the parties that the plaintiff should not be limited to the market value in selling the property, but should be at liberty to obtain the best possible price for the same.

Errors are assigned upon the overruling of the demurrer to the complaint, upon the motion for a nonsuit, upon the amendment made to the complaint at the close of plaintiff's case, upon the reception and rejection of evidence, and upon the instructions given and those refused.

The assignment of error based upon the overruling of defendant's motion for a nonsuit directly raises the question of the right of plaintiff to recover upon the merits as disclosed by his evidence, and for this reason will be first considered. In support of this cause of action plaintiff relied upon the following facts as disclosed by the evidence, viz. : Immediately after entering into the contract with Wolff, he endeavored to negotiate a sale of the lots singly and in pairs from time to time through real estate brokers and others, his efforts in this behalf resulting in varying success until he had sold about thirty-six lots, and from the proceeds of such sales had reduced *pro tanto* his indebtedness to the defendant.

For the amount remaining the defendant held plaintiff's notes, secured upon the lots remaining unsold,—sixty or more in number. At this time the transaction with Calhoun

commenced, which finally resulted in the disagreement between plaintiff and defendant, out of which arose the sole cause of action under consideration upon this appeal. If the " Calhoun deal " had been comsummated as arranged by the plaintiff it would have resulted in Calhoun taking twenty of the unsold lots at a price, payable in cash and notes, that together would have discharged plaintiff's outstanding notes held by the defendant, and plaintiff would have become entitled to a release of the lien held by the defendant upon the lots remaining unsold, and he would have had a clear title thereto.

The facts with reference to the transaction with Calhoun are undisputed, and, as stated by Mr. Smith, the broker selected by the plaintiff to negotiate the sale, are as follows:

" Plaintiff came to me in my office and asked me if I could procure a purchaser for twenty lots in Earl Place on certain terms, that is the party buying the lots would give a certain trust deed of about $350 per lot, he could not tell the exact figures, and a second trust deed, payable to himself, of $2,300 upon the whole twenty-three lots. He said he would like the party to be one that would take the lots and handle them and trade them or build on them or sell them to parties that would build on them.

" I told the plaintiff I thought I could get a man to take hold of the lots, and a day or two later I spoke to Mr. Calhoun about it and he said he would be glad to take the lots on these terms, and I then took him to the plaintiff's office and introduced him to the plaintiff.

" I told Mr. Calhoun that those lots could be had on those terms and gave him to understand that he was not to invest a dollar. I took him to the plaintiff and told him that was the man I had found, that he would take the lots on those terms.

" The plaintiff showed me that through this deal, that he would pay his notes to the defendant, amounting to $10,000; that he would liquidate an indebtedness of $10,000, or whatever the price was.

" I had not agreed with the plaintiff to build on those lots. Nothing was said about that except that he would like to get a party that would trade and handle the lots and if possible would put them in the hands of parties that would build on them."

The transaction was afterwards consummated, in so far as the same could be concluded by Mr. Helbig and Mr. Calhoun, in exact accordance with the foregoing statement of Mr. Smith. There being at this time a balance of principal and interest due Mr. Wolff, amounting to $10,635.13, less 10 per cent commission, or $9,571.62. In other words, the sale which the plaintiff had authorized his agent to make to Mr. Calhoun of the twenty lots in question was for an amount exactly sufficient to discharge plaintiff's obligation to the defendant. In this transaction Helbig was the vendor and Calhoun the vendee, and the latter was to pay nothing from his own resources. The only money agreed to be paid was to be advanced to Wolff by the vendor.

Upon this state of facts the court was called upon to determine as a question of law, upon the motion for a nonsuit, whether or not the Calhoun transaction was one embraced within the written agreement between the plaintiff and defendant, this agreement providing, *inter alia*, that " the purchaser should pay at least one third of the purchase price in cash." It is contended by appellant that the Calhoun transaction was fictitious and fraudulent, made with " a man of straw," without financial responsibility, and that it was one not contemplated by the parties to the original agreement, and not embraced within the true intent and meaning of such an agreement; while the contrary of these propositions is maintained by appellee.

A fundamental canon of construction, with reference to contracts oral and written, requires that the true intent or meaning of the contracting parties shall be ascertained and the contract be construed, if possible, so as to carry out such intent. In the case of *Schuylkill v. Moore*, 2 Whart. 491, it is said : " The best construction is that which is made by view-

ing the subject of the contract as the mass of mankind would view it, for it may be safely assumed that such was the aspect in which the parties themselves viewed it. A result thus obtained is exactly what is obtained from the cardinal rule of intention."

A construction of the contract that will permit the plaintiff to discharge his obligations to the defendant in the manner attempted by the transaction with Calhoun is one that we think must strike the mind of the average man as so unreasonable that it could not have been contemplated by the parties to the written agreement. The defendant then held the plaintiff's notes for $10,635.13, secured on upwards of sixty lots. Plaintiff could have canceled the lien and his obligations at any time by paying this amount less 10 per cent; or, if he could secure a *bona fide* purchaser for a part of the lots, who would pay the amount in cash, or one third in cash and the balance in notes, plaintiff's obligations might in this way have been discharged.

It is obvious, however, that he could not do this by selling one lot for a price equal to the whole amount due,—such a consideration being many times the actual value of the lot, and so grossly unreasonable as to be in fraud of defendant's rights,—and thereby discharge his obligation, leaving him with but little or no security for the unpaid amount. This illustration is sufficient for the purpose of showing that there must be found some rule governing contracts of this nature that will be reasonable and just to the parties and adequately protect the rights of each.

It is to be borne in mind that the chief purpose of the contract is that the defendant shall sell ten acres of land and that the plaintiff shall pay him therefor $20,000. From the evidence it is apparent, I think, that the defendant was willing at all times to convey for this amount, whether the same was paid in cash, or in cash and notes, secured as provided by the contract, as the defendant says he understood it, and as we think he had a right to understand it. It must be assumed that the defendant believed at the time of executing the

contract that his payments would be sufficiently secured if the terms were carried out, and it is certain from the evidence that he believed at the time he was asked to join in a deed to Calhoun that a part of his contract price would certainly be lost should the Calhoun transaction be consummated, and we think it is equally as certain that his apprehensions in this regard were not unfounded.

What, then, did the defendant anticipate would be the construction placed upon the written agreement, and what had he the right to expect in view of the circumstances? Nothing less than a construction that would be at once reasonable, just and equitable to the parties, if such can be reasonably deduced from the instrument. This is in accordance with well settled legal principles, and would be interpreting the instrument as mankind in general would construe it.

We think that a construction which would require the plaintiff to find a purchaser or purchasers who would advance the cash required from their own resources, or at least independently of advances made by the plaintiff for the purpose of securing a release of a lien upon the remaining lots, is the only one that meets the requirements of good conscience and equity. The Calhoun transaction did not contemplate that the plaintiff would advance money to Calhoun, because he (the plaintiff) had money of his own or of others that he was desirous of loaning. On the contrary, plaintiff's avowed purpose was to gain an advantage to himself at the expense of the defendant's security upon the forty or more lots remaining unsold.

Helbig not being limited in the sale of lots to a maximum price, Wolff could only rely upon the self interest of the purchasers to protect him. So long as such purchasers were required to pay one third of the purchase price down, he was content, and it was not until Helbig attempted to remove this safeguard by advancing the cash payment from his own resources that Wolff refused to convey. Helbig could not thus destroy the defendant's security, and Wolff was justified in refusing to carry out the Calhoun deal. A construc-

tion such as contended for by plaintiff would permit him to dispose of lots to irresponsible parties at double, treble or any other multiple of the price that such lots would command in the market, if sold in the usual manner. In our opinion, an interpretation of the contract that will permit this was not contemplated by the parties, is not within the letter of the agreement, but is utterly foreign to the spirit and intent thereof. For this reason I think a nonsuit as to the Calhoun transaction should have been granted.

Aside from these twenty lots, the contract between Wolff and Helbig seems to have been fully executed by Helbig paying his notes in full and Wolff deeding the lots remaining. Wolff should now deed to Helbig lots 25 to 44 inclusive, in block 2, and thereby terminate the controversy.

The judgment of the district court will be reversed.

*Reversed.*

MR. JUSTICE CAMPBELL, dissenting.

I cannot agree with the construction put upon this contract by the chief justice. As I understand the scope of the opinion, one to whom lots are sold and in whose behalf any part of the consideration is advanced by Helbig, by loan or otherwise, cannot be a "purchaser" under this contract. The record shows that one third of the purchase price of the lots sold to Calhoun was advanced by Helbig, to secure the payment of which Helbig gave, or was to give, a second trust deed upon the lots. If Wolff got the cash payment provided for in the contract, which was one third of the amount of the purchase price, less, possibly, the commission belonging to Helbig, and got, in addition thereto, security for the unpaid portion of the purchase money by a trust deed which was a first lien upon the lots sold, which this contract required, then, if the selling price agreed upon was a fair one, Wolff got exactly what he bargained for, and, as it seems to me, it could make no possible difference to him whether Helbig, or some third party, advanced to the ven-

dee the cash payment. Wolff's only additional right under
the contract (that of having an adequate security for the
two thirds of the purchase money unpaid) could always be
preserved by demanding good faith in the sale of lots, and
this right could be protected and enforced by submitting
the question to a jury. A sufficient inducement for Cal-
houn to carry out his contract and pay the balance due to
Wolff, and as a further evidence of good faith, is to be found
in the fact that his obligation was out to repay Helbig for
the cash payment, and it was secured by a second lien upon
the lots.

Upon the trial of this case, all the issues of fact, including
the good faith of the so-called "Calhoun deal," as to whether
or not Calhoun was merely "a man of straw," and the rea-
sonableness of the price at which the lots were sold to him,
were submitted to the jury under appropriate instructions
from the court, and these issues of fact were all resolved in
Helbig's favor. In my judgment, this was the proper course
to pursue, and thereby Wolff's rights (if he had any) would
be amply protected. The hardship of the construction
adopted by the majority of the court is to be seen when
it is said that, as the record shows, Helbig has paid the
entire consideration of $20,000 to Wolff, and the latter still
holds the sixteen lots attempted to be sold to Calhoun.

We cannot close our eyes to the fact that, since the time
when Calhoun bought, this property has greatly depreciated
in value, and for Wolff now to convey these lots to Helbig,
without being required to do more, when the value of the
property to be conveyed is much less than it was when
Wolff should have conveyed it to Calhoun, and much less
than Helbig would thereby and at that time have received,
is not such a compliance upon Wolff's part with his contract
as fair dealing and equity demand.

I think the judgment of the district court should be
affirmed.