King, J.,
delivered the opinion of the court.
This is an action brought by appellee to recover from appellant the principal sum of $1,170, together with interest thereon at eight per cent, per annum, the principal stun named being an amount of money paid by plaintiff to defendant to be by him invested for plaintiff in the purchase of certain specified stocks in a mining company, and which was by him so invested.
The complaint contained two causes of action, the first in tort, and the second in contract. By the first it was in substance alleged: That defendant, about November 12th, 1900, represented himself to be the president of The Butterfly-Terrible Gold Mining Company, a corporation, and that said company owned valuable mines known as The Silver Bell Group in San Miguel county, Colorado, upon which a great amount of development work had been done; that wrongfully and with intent to procure money *451 from the plaintiff, defendant stated that rich deposits of ore had been discovered, and that there was “ore in sight” sufficient to pay dividends for a number of years; that plaintiff, relying upon said representations, purchased shares of stock in said company as follows: November 12th, 1900,. 5,000 shares for''$1,000; March 12th, 1901, 1,000 shares for $385; August 10th, 1901, 1,000 shares for $385; that defendant represented that said investment was perfectly safe, and advised plaintiff to place all the money she had therein; that in fact there was only a small body of ore in said mines, which was of little or no value, and that dividends were not paid except for a part of the year 1901; that the stock was worthless; that February 27th, 1907, plaintiff made demand of defendant for the sum of $1,770 with interest thereon, as damages.
For a second cause of action plaintiff made substantially the same allegations as in the first, with the exception of an additional paragraph, as follows :
(The original was not in italics.)
“That as inducement for plaintiff to purchase said mining stock in the Butterfly-Terrible mine, and as a contract between the plaintiff and defendant, the defendant contracted with the plaintiff, on or about the 12th day of November,. A. D. 1900, that if she would buy said stock (which she alleges she did) he would see her out in her purchases, and see that she received her money with good interest thereon, and that she should not lose anything by her said investment;” and, after alleging the investment of this money in the stock, and that the stock purchased as aforesaid was of no value what *452 ever, alleged “That the plaintiff frequently called upon the defendant therefor, and he repeatedly assured and promised her that she should have her money and interest thereon, the last of said promises being* on or about the 1st day of October, A. D. 1903, and requested her to wait therefor; and relying upon said request and promises, the plaintiff extended the time for the defendant to pay said money and took no steps to enforce the collection thereof until the 27th day of February, A. D. 1907 (more than six years after the purchase), at which time the plaintiff made demand upon the defendant.” She demanded judgment for the sum of $1,-770 and interest thereon from and after August 10th, 1901, at eight per cent, per annum, and that defendant be found guilty of fraud, and be committed to the county jail of the City and County of Denver until the judgment was paid, together with costs.
Demurrer to the first cause of action was sustained, whereupon plaintiff asked and obtained leave to dismiss said cause of action without prejudice, and the case was tried solely upon the second cause of action.
Defendant, for first defense, admitted the corporate capacity of The Butterfly-Terrible Gold Mining Company; that- on or about November 12th, 1900, said company was operating valuable mining-property in San Miguel county, Colorado, upon which there were tunnels, shafts, drifts and crosscuts, and deposits of ore bearing- gold and silver, and that he so represented to plaintiff; that plaintiff made demand on him for the sum of $1,770, on or about February 27th, 1907, no part of which had *453 been paid by liim to plaintiff; denied all other allegations of said cause of action. For second and third defenses, defendant pleaded the statute of limitations. For a fourth defense, denied that he had made the pretended contract, assurances, promises and requests alleged in plaintiff’s second cause of action, or any of them, and alleged that at the time mentioned he was a stock broker, engaged in buying and selling mining stocks for his customers, and that in the course of said business as broker, he sold for a customer to said plaintiff, on or about November 12th, 1900, 5,000 shares of the stock of said mining company, at twenty cents per share, and bought for her on her order, about March 7th, 1901, 1,000 shares at thirty-eight cents per share, for which purchase she paid him a commission of $5, and on August 9th, 1901, 1,000 shares at thirty-eight cents per share, for which she paid him a commission of $5. and that these were the same transactions mentioned in the complaint; that during the entire time from November 12th, 1900,.until November 1st, 1901, stock in said mining company was marketable; that the market price thereof at no time, as bought and sold, fell below the price of twenty-one cents per share, and that the price and value of said stock from January 1st, 1901, to October 31st, 1901, ranged from twenty-six and one-half cents, the lowest, to forty-eight cents, the highest, per share; that all of said facts were well known to the plaintiff; that plaintiff did not at any time authorize defendant to sell or dispose of said stock, or any part of it; that during said time plaintiff might and could have sold her stock at such price as to enable her to receive her entire investment *454 with good interest, and without loss, but that she failed, neglected and refused to sell. To this answer plaintiff filed a reply denying each and every allegation, except that she admitted that defendant was a stock broker, and as such, sold her the mining stock as set forth in the fourth defense.
The evidence upon the part of plaintiff consisted of her testimony and that of her sister, together with certain letters and statements received by plaintiff, or by her sister, the contents of which plaintiff had seen. Plaintiff’s testimony, briefly and in substance, is: That she had been acquainted with the defendant prior to November 12th, 1900, and that he had solicited her to buy stock in this company, in support of which she submitted a letter addressed to her, dated September 22nd, 1900 (being in the form of a prospectus), stating the production of the mine during the. month of August of that year, together with the net earnings and production up to September 18th, and that there was “absolutely no question about the ability of the Butterfly to pay dividends” — closing said letter with the following: “If you have lost money in other stocks this year, this is an opportunity to more than make up your losses, for at the rate at which the shipments are increasing, with an even higher increase in the net earnings each month, we believe the stock is absolutely certain to double in value. We strongly urge you to send in your orders to be' executed at market immediately for as much of the stock as you can possibly carry, and feel it is certain to bring you most satisfactory returns, both in dividends and by an even greater gain in its market value;” also a letter to plaintiff’s sister, dated *455 November 10th, 1900, which plaintiff had read prior to her purchase on the 12th, as follows: “When you called to see me last about Butterfly you will remember that I told-you to wait until we had certain matters arranged which were then pending, and that if the deal went through on which I was working, you were to take 2,000 shares. I have gotten matters arranged so we are going to close this deal up Monday, and you will be safe in putting every dollar you have on earth into it under the conditions. The stock is selling strongly. at 20c and has been for some days, and I believe it is absolutely certain to go up within the next ten days. I understand your position exactly, and I would not accept the order now if we had not gotten things fixed so that I know you cannot lose on it. Please answer by bearer if you can come in Monday morning early. I presume this will interfere with your work, but there is enough at stake to more than make up the loss of an hour or two that day. As I took the order conditionally in this way, you will get the benefit of the market price of the stock on that date. We have all the money pledged we need, and are going to make the payment Monday morning, so that you will run absolutely no risk, and as I know I can make money for you on the -rise, I hope Miss Bahrenburg will be able to do something-in it as well. When we pay the money over the stock is absolutely certain to advance, and nothing-can prevent it. Kindly let me know when to expect you, and believe me,
Yours very truly,
(Signed) CALVIN BULLOCK.”
*456 (Miss Bahrenburg mentioned in the letter is the plaintiff herein, that being her name before marriage.)
On November 12th, 1900, plaintiff went to defendant’s office in the Equitable building, taking with her $1,000 to invest in the stock, at which time she says defendant told her about the ore in sight; and that it would pay dividends for years to come; that she need not fear, “that it was an absolutely safe investment, and that he would see me out with my money, and good interest,” and that acting upon his statements and representations, she gave him the. money, but that she had decided, before she went to see him, to invest $1,000 in the stock. For that sum she received 5,000 shares, which she asked the defendant to keep in his vault for her. Thereafter, on the dates named in the complaint, she purchased 2,000 additional shares, paying therefor $770 including commissions. She testified that at each of the subsequent purchases, namely, in March and August, 1901, defendant again made statements to the effect that the investment was absolutely safe, and that he would see her out with her money and good interest, and advised her to put into the stock every dollar she had or could procure, and that she bought acting upon such statements and representations. On cross-examination she stated that she had such implicit confidence in the defendant that she would have invested the money upon his advice; that she liad not asked him for his guarantee. She further testified that in October, 1903, she had a conversation with defendant about this money, at which time he explained the operation of the mine and advised her to wait a year, to await develop *457 ments, to which she consented; that at that time he told her the ore had pinched ont and the value of the stock had gone down; that he had told her in 1902 the stock had gone down to fifteen cents, or lower, and not to sell it at that low price; that it had been taken off the Colorado Springs Stock Exchange, and that he thought they would strike new ore and the stock would be worth more later; that she did not remember whether she had received printed market reports after the first purchase, but that she had received, notice of dividends, and was paid dividends on the stock, the first about January 28th, 1901, of one-half cent per share; the second a couple of months later, of three-quarters of a cent per share, and the third a little later, of three and one-lialf quarters of a cent-per Share. Upon each of the purchases defendant sent plaintiff a receipt in the following form:
“Miss M. E. Bahrenburg, City.
Dear Sir — I have bought for your account and risk:
Date Shares Stock Price Commission Revenue Tax Nov. 5,000 Butterfly 20 Net 1,000 1,000
12 By check Cr.
Very truly yours,
CALVIN BULLOCK.”
■ Plaintiff’s sister was present at each conversation, and her testimony was substantially the same as plaintiff’s. Relative "to the conversation in 1902, at which the defendant advised them not to sell and that the stock was..taken off the market, she testified: “Q. "What did he say — the words, just as near as you can? A. He advised us to hold the stock until later. Q. Go on; tell the rest of it. A, *458 I don’t know as I can — word for word. Q. Just tell in your own words. A. I think I have given it in substance, what was said: that she was to hold and not to sell. Q. Any particular time asked to hold it, or anything of the kind? A. No — for an advance. Q. What did Mrs. Lewis say to that? A. She consented to do so.” On cross-examination the witness said that at the conversation in 1902 defendant told them the stock had been taken off the mining exchange, and that there was no present sale for it, and advised them to hold it, saying he believed the mine would develop into a good one.
Throughout plaintiff’s examination the court refused to permit either the plaintiff or the defendant to go into the question of the value of the stock. Defendant objected to testimony as to the value of the stock in 1902 and 1903 on the ground that such dates were too remote from the date of the contract to be admissible, but interposed no objection to testimony as to the 'value of the stock from the date of the purchase “until a reasonable time thereafter.”
After plaintiff .rested, and upon determining a motion for non-suit, the court, of its own motion, announced that it would require the stock mentioned to be tendered into court, to be delivered to the defendant in case the jury should find for the plaintiff, the return of the stock to be in addition to the allowance of certain dividends which the evidence showed had been received by the plaintiff upon the stock. The stock was so produced.
For the defense, a witness was called and qualified by showing that he was a resident of Colorado Springs in the brokerage business, and had been for *459 ten years, and in mining stocks; that he was in such business in 1900 and 1901 on- The Colorado Springs Mining Stock Exchange; that he knew the Butterfly-Terrible Cold Mining Company’s stock; that it was listed on that exchange -in the years 1900 and 1901, and that he was familiar with its value and market price during that time; that said stock was sold on the market to a considerable extent. He was asked the market value of the stock between the 12th of November, 1900, and the 1st of September, 1901, but upon plaintiff’s objection, was not permitted to answer. Thereupon, defendant made the following offer:
“To prove by the witness now upon the stand, and by other witnesses in attendance, that between the 12th day of November, 1900, and the 1st day of January, 1902, and Tor some time thereafter, the capital stock of The Butterfly-Terrible Cold Mining Company, being the capital stock of the company referred to in the amended complaint herein, was listed and bought and sold upon the mining exchange of Colorado Springs, and was bought and sold upon the stock market at Denver. That during all of said time the capital stock described in thé amended complaint herein could have been sold upon the market at an amount over and above the amount paid therefor by the plaintiff, with good interest thereon. That during a large portion of said time, and within a reasonable time after plaintiff’s purchases, the stock could have been sold for not less than forty cents a share, and during a portion of said time, including the months of March, April, May, June and July, 1901, the said stock was worth and could have been sold in the market for between *460 forty and forty-eiglit cents a share, and that at no time after the 12th day of November, 1900, to and including the 1st day of December, 1901, was said-stock worth at market price less' than twenty-three and one-half cents per share, and that a great many thousand shares of stock of said company were bought and sold in the market during said period, at prices ranging from twenty-eight cents per share to forty-eight cents per share.” Upon objection by plaintiff, the offer was refused and exceptions taken by the defendant.
Defendant testified that for fourteen and one-half years he had been a stock broker in Denver, buying and selling mining stocks, and other stocks, on commission; that he sold the stock to the plaintiff on November 12th, 1900; that control of the property changed on that day. He denied that at that time, or any other time, he had any conversation in which he stated to plaintiff or to her sister that if they would invest their money in the stock, he would see them out on their money with interest, or anything to that effect; testified that the first 5,000 shares sold to plaintiff, was sold by defendant' for a client, and the shares sold her at later dates were purchased by defendant upon the stock market, upon plaintiff’s order, and at the market price; that'at the time of the conversation in .1903, the mine had been shut down on account of a strike. The amount of ore mined from month to month and from year to year, was shown on a map by different colored lines, which the witness showed and explained to plaintiff. The ore they had been on had pinched out as they went higher in the stope, and it was necessary to go out to the face of the moun *461 tain to get the same ore clmte at a different depth. When the ore gave ont, the revenue stopped, and it was necessary to raise some money to carry on the dead work. Some of the stockholders put up some money to help carry on this work, but no assessments were made. At these times defendant advised plaintiff not to sell her stock, as it was not salable; that the strike lasted for about fifteen months, and it was a case of “wait” for everybody.
The jury returned a verdict in favor of plaintiff for the entire amount of money paid in by her in the purchase of stock, together with interest at eight per cent, per annum from August 10th, 1901, less the sum of $150, dividends received upon the stock. Upon this verdict judgment was rendered, and defendant appealed to the supreme court.
It will not be necessary to discuss all the errors assigned by appellant, nor, indeed, all that have been relied upon in the argument of his counsel. It will suffice to state generally the reasons which make it necessary to reverse the judgment and remand the cause for a new trial.
The errors assigned relate chiefly to the ruling of the court upon the admissibility of evidence, and upon instructions given, or offered and refused. The correctness of such ruling depends upon the construction of the contract pleaded and the consequent theory upon which the case was tried. The conflicting theories upon which the case was tried are well stated by counsel for appellant: ‘‘Assuming that the contract alleged by appellee was made, there were three theories advanced during the trial as to how it should' be interpreted. Under the first it is considered that appellant bound himself to pay *462 to appellee, oil demand, the sum of money paid out by her for stock, with interest thereon. The second theory is, that by the contract, appellant agreed to repurchase the stock bought by appellee at what it cost her, and interest; that neither a demand by appellee for such repurchase, nor a tender or offer of the stock by her to appellant, was necessary before .she began her action, and that appellee’s evidence having shown her contract, it was then sufficient for her to tender the stock at the trial, not voluntarily, but because compelled by the court. By the third theory the contract is construed to be one to save appellee harmless by reason of her purchase of the stock, necessitating loss by her before she could begin her action, and a proof of that loss, and of the extent thereof, before she could recover.”
The theory upon which plaintiff tried the case is not in doubt, for her counsel says: “The appellee insisted upon the trial that the contract was one for the direct payment of the money invested, and interest thereon. There were only two conditions in this contract, viz., for appellee to buy and pay for the mining stock, then she was to have her money and good interest on the same. There were no other conditions annexed to this contract. The only fair construction of the contract, in view of the station in life of the parties, their education, knowledge, and the circumstances under which the purchases were made, and the retention of the stock by appellant, is, that appellant would pay her her money and good, interest, without any conditions, whenever she demanded it of him.” Nor is the theory of appellant in doubt; for, assuming that the words claimed by appellee to have been spoken, were spok *463 en by tlie defendant, witli contractual intent, bis counsel says: ‘ ‘ Obviously the contract was tliat appellee would not lose by her investment; that she would be able so to dispose of her purchase that she would receive back her money invested and good interest. In view of the situation of the parties, the results sought and the subject-matter of the contract, no other construction or interpretation is reasonable or 'even possible. It wa's a contract of indemnity against loss. All that appellee sought, expected or desired, was an assurance that she would not lose the money she invested or the interest thereon. ’ ’
The learned judge who presided at the trial seems not to havé adopted the theory of either the plaintiff or the defendant. But, if we judge correctly from his refuarks made during the trial, his action in requiring the stock to be produced and tendered, and the instructions given upon the measure of damages, the .court adopted the second of the three conflicting theories hereinbefore set forth, namely, that the contract was for the repurchase of the stock. Such is indicated by his remark during the progress of the trial that the second cause of action was “based upon a promise to redeem the stock,” followed by his order requiring the stock to be produced and tendered without the same having been pleaded, over the objection of the defendant, and without the approval of the plaintiff, who,in her brief, said: “Appellee was at a loss then, as now, to see any reason or rule or right of the court, upon its own motion, to require her to tender the stock into court. Appellee never has claimed, and does not now claim, that her contract with the *464 defendant was one to repurchase the stock on demand. ’ ’
The instruction, that if the jury find for the plaintiff, she would be entitled to recover the sum of money paid by her to the defendant, together with interest from August 10th, 1901, the date of the last purchase, and from which date interest was claimed by the complaint, could only be based upon the theory announced by plaintiff, or, upon the theory that the contract was for the repurchase of the stock, upon demand, for the purchase price with interest.
The supreme court, in St. Louis etc. Co. v. Tierney, 5 Colo., 582, announced certain elementary rules applicable to a correct interpretation of the contract under consideration. We quote from the syllabi: *
“It is an elementary principle that the object to be attained in the construction of a contract, is to discover and effectuate the intention of the parties, and to this end the court will adopt that construction which will bring it as near the actual meaning of the parties as the words they saw fit to employ, when properly construed-, will permit. As a guide to a correct interpretation, the law also permits the subject-matter of the contract, the situation of the parties at the time of its execution, and all- the surrounding facts and circumstances to be taken into consideration. A party will be held to that meaning which he knew the other party supposed the words to bear, if this can be done without making a new contract for the parties.”
With these rules in view it is impossible to adopt the theory of plaintiff. It seems wholly un *465 tenable. The transaction was not in the nature of a loan from plaintiff to defendant, nor of a deposit payable on demand. It was, and was by them understood to be and treated as, an investment of plaintiff’s money by defendant in mining stocks which did not belong to him, upon plaintiff’s order, from which she hoped to receive large profit from an early advance in the market value of said stock, predicted by defendant and predicated upon the conclusion of certain changes in the affairs of the mining company, negotiations for which were then pending, and the promise of dividends from the showing made in the mine. The promise of defendant, under any reasonable construction of the contract, was conditional, so far as his liability to plaintiff was concerned, upon her sustaining loss on the investment by depreciation of the stock, and her consequent inability to recover the amount paid therefor by a resale, or failure of the stock to rise in value, or pay dividends, so that she could realize an advance upon the purchase price equal to good interest on the capital. The situation of the parties and their conduct prior, at the time of and subsequent to the purchase, exclude the possibility of the correctness of plaintiff’s theory. Aside from the formal demand made just prior to beginning suit, there is no evidence that at any of the many conversations between plaintiff and defendant, during more than six years that elapsed between the purchase of the stock and the commencement of the suit, a demand was made upon the defendant to pay or repay the money invested, or even the loss thereon. Plaintiff testified that she asked about the money and that defendant requested her to wait, *466 but it is clearly shown by her own and her sister’s testimony that this referred to her inquiry about her stock, and the defendant’s advice .to wait for a more favorable time to sell.'.
Nor do we think the contract is susceptible of the construction apparently placed upon it by the court that it contemplated the repurchase of the stock by the defendant. “A fundamental canon of construction, with reference to contracts oral and written, requires that the true intent or meaning of the contracting parties shall be ascertained and the contract be construed, if possible, so as to carry out such intent.” — Wolff v. Helbig, 21 Colo., 490, 498. It is certain that neither plaintiff nor defendant so understood it. Plaintiff at no time prior to suit offered to return the stock. She did not offer it by her pleading, nor make a tender thereof until required so to do by the court. It seems unusual to force a construction by which the parties to the contract are declared to have had an intention which both deny Both plaintiff and defendant having repudiated that theory, we are not disposed to give it further consideration, although it seems to be the only theory upon which the instruction of the court as to the measure of damages could be predicated, as we take it for granted that the court did not adopt plaintiff’s theory. Taking into consideration the words used, to-wit, that he would see her out with her money with good interest, and that she should lose nothing upon the investment, together with the situation of the parties at the time,' and all the surrounding facts and circumstances, a reasonable construction, and we think the only construction that can be given to the contract, *467 is, that it was one of indemnity against loss; or, guaranty, that in case of loss defendant would reimburse plaintiff to the extent of such loss. Upon that view, the instructions of the court as to the measure of plaintiff’s recovery, constituted error for which the judgment must be reversed. The contract being one of indemnity, the plaintiff must show a loss, and the extent of recovery would be the loss sustained, measured by the difference between the highest value of the stock within a reasonable time after the purchase, and the amount paid for the stock with interest added, less any dividends received thereon, as shown by the evidence; such reasonable time to be determined by the jury under appropriate instructions which take into consideration the fluctuating and uncertain values of mining stocks. And the failure of plaintiff to avail herself of opportunities to realize upon her investment within such reasonable time might be a good and complete defense to the action
Defendant pffered the following instruction which was refused by the court:
“The court instructs you that the burden of proof is upon the plaintiff to show by the preponderance of the evidence not only that the contract alleged by her was made by the defendant, but that she has suffered loss or damage thereunder, and that unless you find by a preponderance of the evidence that the stock purchased by the plaintiff was, within a reasonable time after such purchase, of no value, and continued to be of no value down to the present time, then the plaintiff has not suffered the entire loss which she claims. If you believe from the evidence that the stock was of some *468 value, and could have been sold in the market for some price, then the damage which the plaintiff has suffered, in case you find the contract was made as, alleged, is the difference between the highest value of such stock within a reasonable time after she purchased it, or at any time thereafter, and the amount she paid for the same, with interest on such difference, and loss any dividends she may have received upon such stock.”
This instruction correctly stated, the law with the exception of that portion which gives the highest price of the stock, at any time after the purchase, as a basis for computing loss. We think the plaintiff would be entitled to a reasonable time after each purchase within which to consider and determine whether she would sell the stock or wait for a better price, that being reasonably within the contemplation of the parties, in view of the promise of dividends as well as increase in market value. The following cases are cited in support of the views announced as to the character of the contract and the measure of recovery. — Norris v. Reynolds, 116 N. Y. Supp., 106. Brewster v. Countryman, 12 Wend., 446. Belcher v. Loveland, 119 Mass., 539. Jenckes v. Rice, 119 Ia., 451. Lobeck v. Duke, 50 Neb., 568. Kilbride v. Moss et al., 113 Cal., 432.
The case of Norris v. Reynolds, supra, was one in which a sale of stock was made by a promoter interested in the corporation, who said to plaintiff, “I will guarantee your money, principal and interest. For whatever amount you invest in the stock, you will have my personal guarantee.” In construing this contract, the court said:
“From the plaintiff’s own testimony and the *469 correspondence tliat passed between the parties, it is quite plain that although the word “guarantee” was used, all that the defendant agreed to do was to indemnify the plaintiff against loss in case he should make the investment. The defendant did not agree to repurchase the plaintiff’s stock on demand. ® * * Proof that neither the original stock nor that of the cemetery association had any market value on the stock exchange, was not sufficient proof that plaintiff’s investment had become a total'loss and had no present value whatever. Many kinds of investments and stocks may have some value although not dealt in on the stock exchange. In order to maintain his action against the defendant, upon the defendant’s contract of indemnity against loss, the plaintiff must prove that he has actually suffered loss. * * * In order, however, to call upon the defendant, upon his contract of indemnity against loss, he must show by competent evidence that after the lapse of a reasonable time his stock, or the property right represented by it, has become worthless, or partially worthless. This- can be done by showing through some competent witness, the value of the stock with the rights attached to it. ’ ’
This case seems to have been well considered, the reasoning sound, and the conclusion pertinent and applicable to the instant case. Prom the views we have expressed it follows that in refusing to admit the testimony offered by the defendant to show the value of the stock from the time of the several purchases, and for a period of some months thereafter; in requiring the stock to be produced and tendered; in denying motion for non-suit, and in giving instructions not applicable under a proper *470 construction of the alleged contract, the court erred. The judgment is reversed and the cause remanded for further proceedings in accordance with the views herein announced.